## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA** :

    **v.**                    :   **CRIMINAL NO. 17-132**

**JAMES TURNER**            :

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant James Turner seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the obvious danger that Turner presents to the community, as well as the fact that his medical conditions are well controlled with treatment in BOP custody.

## I. Background.

### A. Criminal Conduct.

In a period of less than 25 hours on February 15 and 16, 2017, James Turner robbed three banks in Philadelphia of over $10,000. While he did not use a weapon during the three robberies, he gave threatening notes to the victim tellers, telling them he was not "playing any games." On July 11, 2017, he pled guilty to three counts of bank robbery, in violation of 18 U.S.C. § 2113(a).

These crimes marked only the latest offenses in an incredible 37-year stretch, throughout his adult life, during which Turner incurred 14 criminal convictions, usually with interruptions only for stretches of imprisonment:

| Year | Age | Principal Charge |
|------|-----|------------------|
| 1980 | 18 | Burglary |
| 1981 | 18 | Robbery and assault |
| 1982 | 20 | Criminal trespass |
| 1983 | 21 | Burglary |
| 1983 | 21 | Theft |
| 1984 | 22 | Burglary |
| 1986 | 24 | Retail theft |
| 1986 | 24 | Theft |
| 1986 | 24 | Burglary |
| 1997 | 35 | Burglary |
| 1998 | 36 | Burglary |
| 2003 | 41 | Burglary |
| 2009 | 46 | Felon in possession |

PSR ¶¶ 54-66.

Although his life of crime has been characterized by burglary and other theft offenses, there have been instances of violence as well. In 1981, when Turner was 18 years old, he robbed a person of five dollars and punched the victim. In 2003, when Turner was 41 years old and he burglarized a store, he and his accomplice struck the store clerk in the eye and kicked him.

Despite numerous convictions and periods of incarceration, Turner's criminal conduct escalated over the years, rather than diminishing as he grew older. Some of his earlier convictions were for stealing purses or bags. In 1998, however, when he was 36 years old, he burglarized a store and stole 17 computers. In 2009, he was convicted of being a felon in possession, and of

making false statements to a federal firearms licensee, after he paid someone to buy a firearm for him, and he then sold the firearm.

All of his crimes, as he admits, were obviously fueled by drug addiction, and they continued even as his health declined. He had a kidney transplant in 2006, *before* his first federal conviction. He nevertheless engaged in federal firearms crimes in 2009. He began dialysis in 2016, after he was released from federal prison, *and was undergoing such treatment at the time he robbed the banks in February 2017*. PSR ¶ 94.

Specifically, he was released from federal prison on November 29, 2016, at age 54. He then committed the three bank robberies at issue in the present case less than three months later, starting a few days before his 55th birthday. At the time, his mother perhaps put it best, telling the probation officer, "My son is a good guy. He is a loving person and giving. He just can't stop stealing." PSR ¶ 91.

That is why this Court imposed a sentence of 96 months' imprisonment, at the top of the advisory guideline range of 77 to 96 months. The Court found that Turner was "incorrigible," "just committed to committing crimes," and a "threat to public safety." N.T. 11/21/17, 8.  In fact, the Court noted that no upward departure would be given because it had not been requested, but that "the record would allow" the Court to do so. N.T. 11/21/17, 9. The bank robbery conviction violated Turner's supervision on the firearms charge, and a sentence of 24 months of incarceration was imposed, on December 14, 2017, for that violation.

Turner is serving his sentence at Federal Medical Center – Devens, with an anticipated release date of November 27, 2023. According to the Bureau of Prisons' calculation, because Turner had jail credit from his earlier periods of incarceration, he is considered to have served 4 years and 10 months, or approximately 49% of his sentence for the bank robbery convictions.

Turner has had only one relatively minor disciplinary violation while serving his current sentence for the bank robberies. However, during his earlier period of incarceration for the firearms offense, he had 13 disciplinary infractions. While many were lower-level offenses, several of them raise a concern about Turner's propensity for violence. In 2012, he threatened a commissary worker with bodily harm. In 2012, he engaged in tattooing or self-mutilation. In 2014, he was found to have been in possession of a razor blade type of weapon and to have manufactured the weapon, but he was found not competent to be held responsible for the violation.

**B.      Request for Compassionate Release.**

On September 10, 2019, Turner submitted a request for compassionate release to the warden. Turner's request was based on the fact that he is on dialysis and purportedly in need of a kidney transplant. The presentence report and Turner's medical records show that Turner received a kidney transplant in 2006. The kidney failed in 2016 – before the latest crimes of conviction – and Turner has been receiving dialysis three times a week since that time. PSR ¶ 94.

Turner's medical records also show that, in February 2020, Turner was evaluated by a head and neck surgeon to plan for a parathyroidectomy to address thyroid issues. Defense Exhibit B.

Turner's request to the warden in September 2019 was obviously made before the coronavirus risk was known, and appears to have been made before surgery was considered to address his thyroid issues. On October 3, 2019, the warden rejected the request for compassionate release. The warden found that Turner has a significant medical history which includes "end state renal disease on hemodialysis, vitamin D deficiency, gout, anemia in chronic kidney disease, hypertension, secondary hyperparathyroidism (of renal origin), benign hypertrophy of prostate, vitamin B12 deficiency anemia, hyperlipidemia, unspecified  osteoarthritis, and disorder of the bone." Defense Exhibit A. The warden concluded, in October 2019, that while Turner had a significant medical history, he was not medically debilitated to an extent that would constitute extraordinary and compelling reasons for release. The warden found that, in October 2019, Turner's medical conditions were treatable, and that "FMC Devens is able to manage your medical needs at this time."

Turner was given notice of the warden's denial on October 9, 2019. In his motion now, Turner claims that he appealed the decision on or about October 9, 2019, and he has received no response to his appeal. Motion at 3. However, the Bureau of Prisons has no record of any administrative appeal being made, and

Turner provided no documentation to show that he did pursue an administrative appeal.

BOP medical records show that Turner's medical condition is presently unchanged. His primary ailment remains end-stage renal disease, and he continues to receive dialysis three times a week. He presents no new complaint.

Throughout his incarceration, Turner has had work assignments that require him to walk and to engage in physical activity. His current assignment, made on February 13, 2020, is to serve both as a compound orderly and as a member of the inside trash crew. He is not bedridden or unable to care for himself.

At a medical evaluation on March 5, 2020, Turner attested that despite increased pain in his knees and ankles, he prefers not to use a walker and is able to walk 20 minutes before there is a lot of pain. The medical staff noted that he is "currently independent with all functional mobility/ADLs," meaning he carries out all "activities of daily living."

At his most recent evaluation, on April 2, 2020, Turner reported continued symptoms of bilateral knee mild osteoarthritis, stating there was stiffness and aching pain that he rated 3 on a scale of 10 upon initiation of walking and other mobility, with gradual improvement over minutes. He said that knee pain returned after long periods of activity and at the end of the day. He said he had no "mobilization limitations on the compound," according to the doctor's summary, but "[s]ome ADLs are difficult, such as reaching under his bed and the

bottom of the locker because he has to kneel down. He denies back pain, denies radicular symptoms, denies paresthesias. He performs PT [physical therapy] home exercises without complaints. No pain at rest during exam today." The examiner concluded: "He is tolerating home exercises well. He has no signs of acute OA [osteoarthritis] exacerbation. He has full ROM [range of motion] and excellent strength without pain. His home exercises were progressed accordingly to include weight bearing eccentrics for improved strengthening with minimized strain on the knees. Reviewed biomechanics of the knee and technique for ADLs to avoid knee exacerbations. No further PT indicated at this time."

In the meantime, on March 27, 2020, Turner presented a motion for compassionate release (although the motion does not appear on the docket). In that motion, he did not describe any new ailment, but sought release based on the emergence of COVID-19, and the risk he would face due to his end-stage renal disease were he to contract the coronavirus. The government objected to consideration by this Court at that time, stating that Turner had not met the requirement of Section 3582(c)(1)(A), that he first present his request to BOP, and wait 30 days after presentation of the request to the warden before filing a motion in court. Following further litigation, on April 7, 2020, this Court entered an order directing Turner to present a request to the warden by April 8, and stating that it would then give the government only 15 days to respond.

Turner's counsel emailed a request to the warden on April 8, 2020. The undersigned advised the BOP institution, FMC Devens, of the Court's order, and

the timetable, and sent periodic reminders. Late on April 23, BOP counsel advised that the social worker's office at Devens, which initiates review of compassionate release requests, had not yet reviewed this request. He stated that the office has been receiving 50 or more such requests a day, making impossible any prompt exercise of the thorough review of compassionate release requests that BOP ordinarily exercises.

Thus, at this writing, BOP has not engaged in administrative review, but this Court has held that Turner may proceed to seek judicial consideration, as he would be able to in any case in which BOP did not reach an administrative determination. We therefore proceed on behalf of the government to address this motion on the merits. The absence of further administrative review is not relevant here, given that this defendant is so obviously not a proper candidate for compassionate release.

## II.   Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1)  in any case—

(A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of

probation or supervised release with or without conditions that does not
exceed the unserved portion of the original term of imprisonment), after
considering the factors set forth in section 3553(a) to the extent that they
are applicable, if it finds that—

(i)   extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements
issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general

policy statements regarding the sentencing modification provisions in section

3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary

and compelling reasons for sentence reduction, including the criteria to be

applied and a list of specific examples. Rehabilitation of the defendant alone shall

not be considered an extraordinary and compelling reason." Accordingly, the

relevant policy statement of the Commission is binding on the Court. *See Dillon*

*v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits

a sentencing reduction based on a retroactive guideline amendment, "if such a

reduction is consistent with applicable policy statements issued by the

Sentencing Commission," the Commission's pertinent policy statements are

binding on the court).[1]

---

[1]  Prior to the passage of the First Step Act, while the Commission policy
statement was binding on the Court's consideration of a motion under
§ 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step
Act added authority for an inmate himself to file a motion seeking relief, after
exhausting administrative remedies, or after the passage of 30 days after
presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4)

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)     Medical Condition of the Defendant.—
>
>> (i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>> (ii)     The defendant is—
>
>>> (I)     suffering from a serious physical or medical condition,

---

of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

        (II)     suffering from a serious functional or cognitive impairment, or

        (III)   experiencing deteriorating physical or mental health because of the aging process,

        that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)    Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)    Family Circumstances.—

        (i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

        (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin,* 2019 WL 2411311, at \*2 (M.D. Fla. June 7, 2019); *United States v. Stowe*, 2019 WL 4673725, at \*2 (S.D. Tex. Sept. 25, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at \*3 (D.N.M. June 7, 2019) (citations omitted).

Here, Turner is eligible for consideration. The government recognizes that, in light of his end-stage renal disease, he is more vulnerable to adverse complications should he contract COVID-19. To be sure, his end-stage renal disease is presently managed, and he is fully ambulatory and capable of nearly all activities of daily living. In ordinary times, he plainly would not be seen as presenting any extraordinary and compelling circumstance as defined by the guideline.[2] But the risk of COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as Turner is less able to protect himself against an unfavorable outcome from the disease.[3]

---

[2] *See, e.g., United States v. Clark*, 2019 WL 1052020, at *3 (W.D.N.C. Mar. 5, 2019) (defendant suffers from declining health, diabetes, kidney failure, and back problems requiring a walker; court holds that, even assuming the defendant is suffering from a serious physical or medical condition or deteriorating physical health due to age, she still falls short of the "extraordinary and compelling" standard because she has not demonstrated that her condition substantially diminishes her ability to provide self-care within the corrections environment or that she is not expected to recover); *United States v. Goode*, 2020 WL 58272 (S.D.N.Y. Jan. 6, 2020) (while inmate's kidney disease is incurable, and she receives dialysis, "her disease is treatable, she is responding well to that treatment, and she does not have an 'end of life trajectory.'").

[3] Accordingly, this Court need not consider Turner's suggestion that his condition falls under the "catch-all" provision of note 1(D), Motion at 4, as the government acknowledges that he meets the threshold test of a medical condition defined in note 1(A).

However, Turner is not entitled to relief, as this Court must also weigh the 18 U.S.C. § 3553(a) factors, and assess whether Turner presents a danger to the community.

He obviously does. At the risk of repetition, this is a man who committed crimes continuously for 37 years, and most recently, robbed three banks **while on kidney dialysis**. He is also a lifelong drug addict. The defense acknowledges: "Mr. Turner's criminal history involved non-violent burglary and theft-related offenses which were most likely committed to support his pervasive drug addiction." Motion at 11. The notion of such a person being released early into the community at any time, and particularly during a pandemic, is shocking, given the obvious risk to his own safety, that of others, and that of the law enforcement officers who will almost inevitably be required to intervene.

In essence, as a 58-year-old man suffering from end-stage renal disease, Turner is little removed from the 55-year-old man, suffering from the same condition, who this Court elected to sentence at the high end of the guideline range to a term of imprisonment of 96 months in order to protect the community from his commitment to crime. Truly nothing has changed, except for the emergence of the coronavirus. And in fact, it seems certain that the coronavirus presents more danger to him out of prison than in it (putting aside the separate need to protect the community from him).

At FMC Devens, a state-of-the-art prison medical facility where BOP is dedicated to protecting against COVID-19, and will provide all available

treatment to those inmates who nevertheless contract it, as of this writing, a single inmate has been diagnosed with the disease, out of an inmate population of 905 individuals, and no staff member. In the meantime, the disease is sadly rampant in Philadelphia, where Turner says he would return to live, Motion at 17. As of this writing, there are 11,226 residents of the city diagnosed with the disease, and 443 people have died.[4] Releasing Turner at this time is a recipe for disaster.

Defense counsel nevertheless states: "there is every indication that Mr. Turner has developed a contrite heart and will strive to never repeat the mistakes of his past." Motion at 11. She cites no source and no reason whatsoever for such blind optimism. But warming to the subject, counsel continues:

> Mr. Turner has reflected on his actions and acknowledged the mistakes he made and the harm his prior criminal conduct caused to his victims. He also has reflected on what led him to make poor life choices. Sadly, when faced with the diminished quality of life that is his inevitable future, his respect for life has been renewed. He has very few desires at this stage, except to live out the remainder of his days surrounded by his loving family and friends, instead of remaining incarcerated in a facility that is far from his family and home in Philadelphia.

Motion at 13. All of this may get high marks for creative writing, but Turner's life of crime and recidivism gives no reason whatsoever to believe or trust that a word of it is true.

---

[4]  In fact, while no person at the federal prison in Philadelphia has been diagnosed with the disease, as of this writing, the undersigned is informed by Pretrial Services that several defendants on pretrial release in this district have contracted COVID-19, and one passed away.

Turner is a career offender, whom this Court saw fit just three years ago to receive an eight-year sentence, at the top of the range, to protect the community. He is currently well cared for. At this difficult moment in time, it is the courts' responsibility to balance the needs of criminal offenders with the vital need to protect the public. In the present case, the outcome of that balance is unmistakable.

Other courts have recently denied compassionate release in virtually identical circumstances. In *United States v. Stuyvesant*, 2020 WL 1865771 (S.D. Fla. Apr. 14, 2020), the court last week, presented with a compassionate release motion based on the threat of COVID-19, assumed that that the defendant as represented suffers from end-stage renal disease, but denied the motion because the defendant is a repeat drug offender who committed offenses while suffering from the same condition. The court stated:

> [T]he Defendant is a repeat drug offender. He was first exposed to Hepatitis C in 1993—while he was incarcerated for committing a separate drug offense. *See* Mot. at 4. But neither this exposure nor the many medical complications that ensued deterred him from committing other crimes. To the contrary, although he was released from federal prison in 2006, and despite his end-stage liver cirrhosis, *see id.*, he went on to commit, just three years later, the serious drug offense for which he is now incarcerated. The Defendant's suggestion that his liver cirrhosis entitles him to early release thus ignores the fact that he suffered from this very same condition when he committed the crime for which he now seeks release. The Court cannot agree that a defendant who is physically and mentally well enough to commit a serious federal crime is somehow not well enough to serve the sentence to which that crime inevitably exposes him.

*Id.* at *7.

The court reached the same result earlier this month in *United States v. Esparza*, 2020 WL 1696084 (D. Idaho Apr. 7, 2020), where the defendant was 70 years old, had served more than 12 years in prison, and was experiencing a serious deterioration in physical health as he aged; but this was his fifth drug conviction over a span of decades, he led a substantial drug organization which involved firearms, and he suffered from some of the same conditions at the time. The court stated: "Esparza argues that his current medical conditions reduce the risk of his returning to drug dealing. However, he committed his last drug trafficking offense while suffering from some of those same medical problems." *Id.* at *4. The court concluded: "Esparza had drug trafficking convictions at ages 23, 40, 44, 50 and 59. It would be foolish to assume that he is unlikely to return to peddling drugs at age 70." *Id.* at *2.

It would be equally foolish to believe here that Turner, at age 58 and fully ambulatory, after a life of crime that included offenses committed recently while suffering from the same ailments he presents now, would act any differently if released. The motion for compassionate release should be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Kathleen M. Gaughan, Esq.
Federal Community Defender Office
   for The Eastern District Of Pennsylvania
Suite 540 West - Curtis Center
601 Walnut Street
Philadelphia, PA  19106


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney


Dated:  April 23, 2020.